IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY WILLIAM GEHA,

  Petitioner,     Case No. 2:06-cv-00577 ALA (HC)

 vs.

MIKE KNOWLES, Warden,[1]

  Respondent.     ORDER

_____/

  Petitioner Jay William Geha, a state prisoner proceeding with counsel, filed an application for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(a), on March 20, 2006.[2] (Doc. No. 1) Respondent filed a motion to dismiss Petitioner's application on May 25, 2006.[3] (Doc. No. 8) Respondent maintains that

---

[1] The named respondent in this case was Kathleen Prosper, the Warden of the California Correctional Center ("CCC"). However, Petitioner has been transferred from CCC to the California Medical Facility where Mike Knowles is the current Warden. Respondent requests that this Court substitute the correct Warden in this matter. The Court grants Respondent's request. *See Brittingham v. United States*, 982 F.2d 378, 379 (9th Cir. 1992) (holding that the proper respondent in a federal habeas corpus petition is the petitioner's "immediate custodian").

[2] Petitioner was appointed counsel after he filed his application for a writ of habeas corpus.

[3] This case was assigned this Court on June 29, 2007.

Petitioner's application was filed beyond the one-year statute of limitations set forth in 28 U.S.C. § 2244(d).  In his response in opposition to the motion to dismiss, Petitioner maintains that his application is timely because he is entitled to equitable tolling of the limitations statute.  On May 20, 2008, an evidentiary hearing was held concerning Petitioner's equitable tolling claims.  As set forth below, Petitioner is not entitled to equitable tolling.  Therefore, Respondent's motion to dismiss is granted, and the petition is DISMISSED.

I

In 1998, Petitioner was arrested for assault on a peace officer with a semiautomatic firearm and manufacturing of a controlled substance.  He plead guilty pursuant to a plea agreement.  He also admitted to a prior murder conviction as a prior "strike" and as a sentence enhancement.  Cal. Penal Code § 667(a), (e).  (Doc. No. 32-2)  Petitioner stipulated that, "as a result of [his] plea, he "may serve" the "maximum sentence" of "36 years 4 months."  (Doc. No. 32-2)  Per the terms of the plea agreement, Petitioner waived his right to appeal, with the exception of "any appeal to sentencing error."  Petitioner signed the plea agreement under penalty of perjury, and declared that he "read" and "understood" what he was signing and that "everything on the form [was] true and correct."  (Doc. No. 32-2)

The sentencing hearing took place on January 4, 2000.  At the sentencing hearing, Petitioner stated that he had "about eight years of college."  He also stated that he "read and understood his plea."  (Doc. No. 32-5)  During the hearing, Petitioner had the following exchange with the sentencing judge:

> [Sentencing Judge]: Mr. Geha, do you have any questions regarding this disposition?
>
> [Petitioner]: No, sir.
>
> [Sentencing Judge]: Have you had enough time to talk to Mr. Forland [Petitioner's state counsel] about all the ramifications of this plea and admission?
>
> [Petitioner]:  Yes, sir.

> [Sentencing Judge]: All right, are you telling me you are certain this is what you wish you to do?
>
> [Petitioner]: Yes, sir.

(Doc. No. 32-5) Judgment was entered against Petitioner and he received a determinate state prison term of thirty-six years, four months. The sentencing court advised Petitioner that he had the right to appeal the sentence which required that a notice of appeal be filed within sixty days.[4] Petitioner did not appeal the judgment.

Over three years later, on January 27, 2003, Petitioner filed a petition for habeas corpus relief in the California Supreme Court. In his state petition, he explained, under penalty of perjury, the following reasons for the delay in filing it: "*First, petitioner was not advised that he could appeal after entering guilty pleas;* Second, petitioner is a layman at law; Third, petitioner just recently started researching the errors/constitutional violations of his rights, etc." (Doc. No. 32-3) (emphasis added). On September 10, 2003, the California Supreme Court, in an unreasoned decision, denied his petition.

On August 23, 2004, Petitioner filed his second petition for habeas relief in the California Supreme Court. In this petition, he did not state that his petition was delayed because he was unaware of his right to appeal. Instead, he asserted: "I requested my attorney, Denny Forland, help me appeal the sentence and he said he would begin the process, but he failed to do so." (Doc. No. 32-4) On July 13, 2005, the California Supreme Court denied his petition citing *In Re*

---

[4]The sentencing court explained to Petitioner's right to appeal as follows:

> You have the right to appeal. If you wish to appeal, you must file a written notice of appeal with the clerk of this court within 60 days of today's date. If you do appeal and are unable to hire a lawyer, the appellate court will appoint a lawyer to represent you on appeal free of charge. You also have a right to a free transcript and record of the necessary proceedings in this court. The written notice of appeal must be timely filed.

(Doc. No. 32-5 at 31-32)

*Clark*, 5 Cal. 4th 750 (1993) (holding absent justification for the failure to present all known claims in a single, timely petition for a writ of habeas corpus, successive or untimely petitions will be summarily denied unless it would result in a fundamental miscarriage of justice). (Doc. No. 32-4)

On March 20, 2006, Petitioner filed his federal application for a writ of habeas corpus. Respondent filed a motion to dismiss on the grounds that Petitioner's application was filed beyond the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Petitioner opposed the motion and requested an evidentiary hearing on his equitable tolling claims. The Court granted his request. An evidentiary hearing was held on May 20, 2008. The evidence and testimony elicited at the hearing is discussed in Section III below.

## II

Petitioner does not dispute that the statute of limitations to file a federal application for a writ of habeas corpus ran on March 5, 2001, absent any time for tolling. The limitation provisions of AEDPA that apply to this matter read as follows:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.
>
> The limitation period shall run from the latest of the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . .

28 U.S.C. § 2244(d)(1)A).[5] Section 2244(d)(1) sets forth a tolling provision of the one-year statute of limitations quoted above in the following words: "The time during which a properly filed application for state post-conviction or other collateral review with respect for the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

---

[5]AEDPA applies to this matter because the application for a writ of habeas corpus pursuant to § 2254(a) was filed after April 26, 1996, the date the statute was enacted. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).

As noted above, Petitioner did not file a direct appeal from the judgment entered on January 4, 2000. There is no dispute that the state appeal process became "final" within the meaning of § 2244(d)(1)(A) when the time for filing an appeal expired sixty days later, on March 5, 2000. Cal. Rules of Ct., Rule 8.308 (providing that a notice of appeal "must be filed within 60 days after the rendition of the judgment"). The one-year time period to file a federal application for a writ of habeas corpus commenced March 6, 2000. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (explaining that Rule 6(a) of the Federal Rules of Civil Procedure applies to "AEDPA's one-year grace period"). Thus, the last day for Petitioner to file a timely federal application for a writ of habeas corpus was March 5, 2001, plus any time for tolling. Petitioner did not file his § 2254(a) application in federal court until March 20, 2006, over five years after AEDPA's one-year statute of limitations ran.

### III

### A

Petitioner argues that he is entitled to toll the one-year statute of limitations. Respondent argues that Petitioner is not entitled to statutory tolling because he "did not file any state post-conviction collateral challenges within the limitations period." Petitioner, however, contends that he is entitled to equitable tolling.

Specifically, Petitioner maintains that he is entitled to equitable tolling for three reasons. First, he contends that Mr. Forland, his state attorney, told Petitioner he was filing a state appeal, but did not do so. Second, Petitioner argues that Mr. Forland did not timely provide him with his case file upon request. Finally, Petitioner contends that he "has suffered from a number of medical problems, including depression and attention deficit disorder (ADD), which have prevented him from filing a petition on his own." (Doc. Nos. 17, 43)

On May 20, 2008, the Court held an evidentiary hearing concerning Petitioner's equitable tolling claims. At the evidentiary hearing, Petitioner called John Wicks, Ph.D., as a witness with respect to his mental disabilities claim. Dr. Wicks is a clinical neuropsychologist in private

5

practice. Dr. Wicks testified that, upon the request of Petitioner's counsel, he conducted "about a day and half evaluation [of Petition], testing him for intellectual processing, for attentional factors, for memory processing, and for potential for malingering." Dr. Wicks also interviewed Petitioner and his mother, and read "800 plus" pages of Petitioner's medical records. RT at 9.

Dr. Wicks testified that "testing showed, in general, that [Petitioner] had about an average IQ . . . . His verbal IQ was in the average range, his performance . . . was actually in the high average range, with the full IQ being in the average range of 104." RT at 9. Dr. Wicks also testified about the particular tests he gave to Petitioner to measured his "working memory." Dr. Wicks explained that for one particular working memory test, Petitioner "scor[ed] in the low end of the average range. On other tests he is in the impaired range." RT at 13. When asked if the testing was "consistent with someone who suffers from ADHD" (which stands for Attention Deficit Hyperactivity Disorder), Dr. Wicks answered "yes and no." RT at 17. Dr. Wicks explained that Petitioner had ADHD without hyperactively. Specifically, Dr. Wicks made the following "diagnosis" about Petitioner's "mental functioning and conditions:"

> He's a gentlemen with an average IQ. He's had what looks like a pattern of disparate development, intellectual development. And particularly – in particular he has problems with processing information in working memory, and he has attentional difficulties which appear to be more of a problem with auditory – both less than normal, but auditory processing appears to be worse than visual processing in general . . . From the information I have, it's a consistent pattern that he has a mild form of ADD . . . Nowadays, ADHD without hyperactivity.

RT at 22-23.

Petitioner's counsel asked Dr. Wicks how "that condition [would] affect Mr. Geha's ability to organize his thoughts in writings?" Dr. Wicks responded: ". . . They [individuals with Petitioner's condition] tend not to do well with, for instance, writing term papers in English classes. Or they don't do well with writing – they don't do well with complex writing. Simple

writing is usually not a problem unless it's the most severe cases." RT at 24.[6]

Dr. Wicks's direct examination concluded as follows:

> Q. BY MR. BALAZS [Petitioner's counsel]: How is Mr. Geha's condition and mental functioning different from an average person, or normal person, with respect to his ability to be able to research the law?"
>
> MR. ELDRIDGE [Respondent's counsel]: I object . . . .
>
> THE COURT: I'll sustain the objection. It's not clear to me – the doctor has already said that he would have difficulty with complex matters. I'm not sure how specific he can go beyond that unless you show his expertise in being able to determine how one who is not a lawyer can perform that task. It's tough for many people who are not impaired.
>
> Q. BY MR. BALAZS: . . . In your evaluation of Mr. Geha and the review of the records, can you give an opinion of his ability to comprehend textbooks or reading materials?
>
> A. Compared to someone of his intellectual ability, he is going to perform significantly lower, in quantitative terms ten to fifteen IQ points lower, than someone with the same relative IQ . . . .
>
> Q. And wold your opinion be the same in terms of being able to write analysis from materials that he's reviewed and read?
>
> A. The more complex the written task is, the more the difficulty is going to increase geometrically . . . [his] intellectual organizational skills are just not good for someone of his IQ.

RT at 31-32.

On cross-examination, Dr. Wicks admitted that he knew that Petitioner is a licensed vocational nurse which requires taking and passing written tests. RT at 35-36. He also testified that he believed that Petitioner would be able to remember "the year he was convicted," and "the year he went to prison." RT at 38. Dr. Wicks also stated that Petitioner would have the "capacity" to have understood that the had "entered a plea of guilty," to know that he "had a

---

[6]Dr. Wicks also testified that Petitioner "was treated for depression back in the nineties," prior to his current incarceration. RT at 25.

right to appeal," and to know that "no appeal had been filed." RT at 53-55.[7]

Petitioner also testified at the evidentiary hearing. Petitioner testified that he completed high school and took college classes, and that he is a licensed vocational nurse. To receive his license, he had to take and pass written tests, but he testified that he "did a lot of cheating to get through school." RT 67-69. He also testified that, although he knew that he was diagnosed with ADD, he did not inform any prison official when he was initially admitted to prison. RT at 71.[8] In prison, Petitioner works as an "ADA disabled escort," which requires him to move prisoner patients from one location to another. RT at 88. Petitioner also stated that his memory was "getting worse" overtime, which suggested that in 2000 to 2002 his memory was better than it was at the evidentiary hearing. RT at 73.

Petitioner testified that at the January 4, 2000 sentencing hearing he asked Mr. Forland, his attorney at that time, to "start an appeal." RT at 58. For approximately the first ten-month period of his sentence, Petitioner was incarcerated at Calipatria State Prison. Because Calipatria State Prison was "on lockdown status" during this time period, Petitioner was allowed one telephone call per month. Instead of calling Mr. Forland, he called his family. RT at 60. He testified, however, that he wrote a "few letters" to Mr. Forland about the status of his case, but never received a response from him. RT at 60, 61. Petitioner testified about a letter to his mother dated January 28, 2000, in which he wrote that he had requested an appeal from his attorney. RT at 62; Pet.'s Ex. 3.

Petitioner testified that it was "[s]ometime in 2001" when he first realized that Mr. Forland had not filed an appeal. RT at 63-64. Sometime in the "middle of 2002," he spoke to

---

[7]Respondent's counsel objected to "the three last sentences of the first full paragraph appearing on Petitioner's Exhibit Number 1 [Dr. Wicks's report]." RT at 55. The Court deferred ruling on the objection until issuing this order. Having reviewed the report, the Court overrules the objection.

[8]The parties do not dispute that Petitioner has not received medication for ADHD (formerly ADD) since his incarceration.

another inmate who prepared his first petition for a writ of habeas corpus to the California Supreme Court. That petition was filed on January 27, 2003. He testified that he did not read the petition, even though he signed it under the penalty of perjury.[9] RT at 80-83. He further testified that the statement in the petition that he "was not advised he could appeal after entering a guilty plea" was "not true." RT at 64, 65-67. Petitioner later learned that the California Supreme Court denied his petition, and he "thought that was the end." RT at 75. However, he testified that "a couple years after," he contacted his sister to help him with his "legal challenge." RT at 76.

On cross-examination, Petitioner testified that he never asked Mr. Forland for his case file. He stated that "my mom and my dad or my mom and my sister were trying to get my files from Denny Forland." Rt at 86. Petitioner did not remember when his family requested his files. RT at 87.

Petitioner also submitted two declarations, one from his mother, Norma Jean Geha, and the other from his sister, Lauren MacQuown.[10] Ms. Geha declares that she received a letter from Petitioner dated January 28, 2008, in which Petitioner told her that he had asked Mr. Forland to file an appeal. Ms. Geha also states that she "made several follow-up calls to get [Petitioner's case] files [from Mr. Forland]." Sometime after she sent a follow-up letter dated December 30, 2003, she went to Mr. Forland's office who "allowed [her] . . . to copy some of the materials in the file," but "did not allow [her] to take the file." Petitioner's mother also stated: "On August

---

[9] On cross-examination, Petitioner was asked, "And you understand the concept of perjury," and Petitioner answered, "Correct." RT at 79.

[10] Because the evidentiary hearing was limited to two hours, Petitioner contends that he was "unable to present the testimony of two additional witnesses," his mother and his sister. Petitioner states that they were prepared to testify to the facts as set forth in their declarations. (Doc. No. 43, n.1) Respondent objects to the declarations on the grounds that they were not admitted into evidence at the evidentiary hearing and that Respondent did not have the opportunity to cross-examine the witnesses. (Doc. No. 44, n.2) The Court overrules Respondent's objections. These witnesses were present at the evidentiary hearing and available to testify. Morever, Respondent admitted declarations during the hearing without the opportunity for Petitioner to cross-examine the declarant.

31, 2006, Mr. Forland's secretary told me that I could pick up the file on September 5, 2006." (Doc. No. 17, Norma Jean Geha Decl.)

Ms. MacQuown declares that Petitioner contacted her in October 2003 "to help him prepare and file a challenge to his conviction and sentence after a habeas corpus petition, which another inmate prepared for him, was denied." She also states that in "February 2004, Mr. Forland allowed her and her mother to come to his office and copy some of the materials in his file." (Doc. No. 43, MacQuown Decl.)[11] According to Ms. MacQuown, she helped prepare Petitioner's second petition for a writ of habeas corpus which she mailed on August 18, 2004. She also helped prepare his federal application for a writ of habeas corpus which was filed on March 20, 2006. (*Id.*)

At the evidentiary hearing, the Court admitted declarations submitted by Respondent. (Doc. No. 32-2 to 32-5). Jeannie Weil, Mr. Forland's secretary, declared: "On or about February 5, 2004, Bonnie Geha came to Mr. Forland's law office and was provided with the case file for her son Jay William Geha. I asked Ms. Geha to flag whichever documents she desired copies of and I then made copies of all the flagged documents and provided them to Ms. Geha." (Doc. No. 32-2 at 18).

**B**

A petitioner is entitled to equitable tolling of AEDPA's limitations period "only if extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time . . . . When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate." *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999) (internal citations omitted). Thus, to establish equitable tolling, Petitioner has to prove "two elements: (1) that he has been pursuing

---

[11]The Court notes that Ms. Geha's and Ms. MacQuown's declarations are inconsistent on this point. Ms. Geha states that she went to Mr. Forland's office with her "granddaughter and Jay's daughter Tiffany." Ms. MacQuown, however, declares that she is the one who went to Mr. Forland's office with Ms. Geha.

his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  These extraordinary circumstances must be "the cause of [the] untimeliness." *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003).

**1**

First, Petitioner seeks equitable tolling for the time period when he thought Mr. Forland was in the process of filing a state appeal.  That time period would start on January 4, 2000, when Petitioner testified that he told Mr. Forland to file a notice of appeal, through "sometime in 2001," when Petitioner testified that he discovered an appeal had not been filed. To corroborate his testimony, he relies on a letter dated January 28, 2000, in which he asked his mother to check with Mr. Forland on the status of his appeal.  He also testified that Mr. Forland did not respond to the "few" letters he sent to him about the status of his appeal.

Petitioner's testimony at the evidentiary hearing is in direct contradiction to his statement in his first habeas petition wherein he declared, under the penalty of perjury, that he "was not advised that he could appeal after entering guilty pleas."  The Court finds that Petitioner's inconsistent testimony and demeanor, which the Court observed while he was testifying at the evidentiary hearing, cast doubts on his credibility.  His testimony that he did not read the state petition he signed is unconvincing.  Petitioner cannot now contend that he thought Mr. Forland was filing an appeal, but then sign a court document, under penalty of perjury, that he did not know he had a right to file an appeal.  *See, e.g., Whaley v. Beeleque*, 520 F.3d 997, 1002 (9th Cir. 2008) ("We may not allow the state to represent in federal court the opposite of what it represented to the state court . . . .").  Thus, his claim that he was inactive during this time period because he believed that Mr. Forland had filed his appeal is unconvincing.

Petitioner's argument that prison lockdowns prevented him from calling Mr. Forland during this time period is also unconvincing.  While incarcerated at Calipatria State Prison, Petitioner had the opportunity to call Mr. Forland at least once a month.  He did not do so. Prison lockdowns is not a ground for equitable tolling.  *See, e.g., United States v. Van Poyck*,

980 F. Supp. 1108, 1111 (C.D. Cal. 1997) ("Defendant has not stated why a few security lockdowns in his place of incarceration over the last few months have 'made it impossible for him to file [his] petition on time.'") (citation omitted). "Prisoners familiar with the routine restrictions of prison life must take such matters into account when calculating when to file a federal [habeas] petition" *Atkins v. Harris*, 1999 WL 13719, *2 (N.D. Cal. Jan. 7, 1999) (reasoning that "lockdowns, restricted library access, and transfers do not constitute extraordinary circumstances sufficient to equitably toll the [AEDPA] statute of limitations.").

Petitioner has also failed to show why, when he allegedly found out "sometime in 2001," that Mr. Forland had not filed an appeal, he waited almost two years to file his January 27, 2003 state petition for a writ of habeas corpus. Thus, Petitioner's argument that "the initial time period after Geha's sentence should be tolled" fails. He is not entitled to equitable tolling for this time because the evidence establishes that he was not diligently pursuing a request for habeas relief. *Pace*, 544 U.S. at 418-19.[12]

**2**

Equitable tolling may be appropriate where counsel fails to provide a copy of a transcript upon petitioner's request, and that failure "'was the cause of his untimeliness'" in filing a federal application for a writ of habeas corpus. *United States v. Battles*, 362 F.3d 1195, 1197, 1198 (9th Cir. 2004) (remanding the case "for a further development of the record on the issue of just what counsel did or did not do, and on the issue of causation") (citation omitted). Petitioner admitted during the evidentiary hearing that he did not personally contact Mr. Forland to request a copy of his case file. Petitioner's mother and sister stated that they asked Mr. Forland for Petitioner's case file. In a letter to Mr. Forland, Ms. Geha writes that the files were requested once in 1999

---

[12]The Court notes that if Petitioner was entitled to equitable tolling through the end of 2001, he would have had until the end of 2002 to file a timely federal application for a writ of habeas corpus. Because his January 27, 2003 state petition for a writ of habeas corpus was filed after the limitations period expired, he would not be entitled to statutory tolling and his March 20, 2006 federal application would be untimely.

and also in October and December 2003.  (Doc. No. 17, Norma Jean Geha Decl.)  On February 5, 2004, Petitioner's mother went to Mr. Forland's office and copied part of Petitioner's file.  This evidence shows that Mr. Forland delayed in promptly providing Petitioner a copy of his case file.  The issue, then, is whether Mr. Forland's delay was the cause of Petitioner's untimeliness in filing his federal application for a writ of habeas corpus.  *Id.*

Petitioner contends that he needed his case file to establish his "ineffective assistance of counsel claim and other potential claims for habeas relief."  (Doc. No. 43)  There is no evidence that Petitioner needed the case file in order to submit his January 27, 2003 state petition for a writ of habeas corpus.  Petitioner has not explained why he submitted his January 27, 2003 state petition without his case file, but was unable to do so for his On August 23, 2004 state petition or his March 20, 2006 federal application.  Indeed, he could have filed a bare-bones federal application for habeas relief to stop the clock because, as a *pro se* prisoner, any document he would have filed would have been liberally construed.  *See Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006) ("We must 'construe *pro se* habeas filings liberally.'") (citation omitted) ; *see also Brown v. Vasquez*, 952 F.2d 1164, 1169 (9th Cir. 1991) (construing a request for appointment of counsel and a declaration wherein petitioner stated he "intend[ed] to file a petition" as a timely filed application for a writ of habeas corpus).

Thus, Petitioner has not shown how the failure to have access to his file caused the delay in the filing of his federal application for a writ of habeas corpus.  *See Battles*, 362 F.3d at 1198 ("Surely due diligence requires that [Petitioner] at least consult his own memory of the trial proceedings"); *see also, e.g, Gassler v. Bruton*, 255 F.3d 492, 495 (7th Cir. 2002) ("Possession of a transcript . . . is not a condition precedent to the filing . . . . A petition seeking collateral relief could have been filed, following which, if necessary for decision of the issues raised, the court could have ordered production of the transcript . . . And we are not told which particular claims petitioner was prevented from raising by the lack of a complete transcript."); *Van Poyck*, 980 F. Supp. at 1110-11 (holding that the inability to secure copies of transcripts did not

constitute extraordinary circumstances).

Petitioner has also failed to explain why, after his family had access to his case file on February 5, 2004, six months passed before he filed his second state petition on August 23, 2004. Nor has Petitioner explained why, after the California Supreme Court denied his second state petition on July 13, 2005, another eight months passed before he filed his federal application for a writ of habeas corpus on March 20, 2006. Thus, the Court notes that if Petitioner had been entitled to equitable tolling through February 5, 2004, his federal application would not come within the one year statute of limitations.

To the extent that Petitioner is maintaining that his mother and sister only had access to "some" of the documents in his case file, as opposed to his entire case file, his argument fails. Ms. Wiley, Mr. Forland's secretary, declared that on February 5, 2004, Ms. Geha flagged the documents in his case file that she "desired" and that copies of the flagged documents were provided to her. There is no evidence that Petitioner's mother or sister desired to have more copies than the "some" documents that were flagged and copied on February 5, 2004.

### 3

Petitioner argues that he is also entitled to equitable tolling because he "was unable to prepare a habeas petition on his own because of his untreated attention deficit disorder . . . ." (Doc. No. 43) A petitioner's mental incompetency may warrant tolling for the period that he was incompetent. *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2003). The mental incompetency, however, must have caused the petitioner to fail to meet the AEDPA deadline. *Id.* ("Where a habeas petitioner's mental incompetence in fact caused him to fail to meet the AEDPA filing deadline, his delay was caused by an 'extraordinary circumstance beyond [his] control,' and the deadline should be equitably tolled.").

The evidence does not support Petitioner's argument. Dr. Wicks testified that Petitioner had only a "mild form of ADD . . . Nowadays, ADHD without hyperactivity." He further testified that Petitioner had an "average IQ." While Dr. Wicks testified that Petition may have

14

problems with "complex writing," he admitted that "simple writing" would not be a problem. Dr. Wicks was unable to explain how an individual with a mild form of ADD and an average IQ would be mentally unable to file a timely federal application for a writ of habeas corpus. His testimony was not helpful as to whether Petitioner had the mental capacity to understand the time limits for filing a federal application for a writ of habeas corpus.

Petitioner conceded that he completed high school, took college classes, and earned a license as a vocational nurse which required him to take and pass written test. In prison, he worked as an "ADA disabled escort," which required that he remember where to move inmate patients. The evidence does not show that he had any less of an understanding of the requirements to file a timely federal application for a writ of habeas corpus than an average layperson. *See, e.g., Atkins v. Harris*, 1999 WL 13719, *2 (N.D. Cal. Jan. 7, 1999) ("Petitioner's alleged lack of legal sophistication also does not excuse the delay.").

The evidence fails to show that Petitioner's mental capacity created "extraordinary circumstances" beyond his control that made it impossible to file a federal application on time. *Pace,* 544 U.S. at 418; *see also Gaston v. Palmer*, 417 F.3d 1030 (9th Cir. 2005), *withdrawn*, 417 F.3d 1050, *amended* 447 F.3d 1165 (9th Cir. 2006) (rejecting petitioner's argument that his physical and mental abilities constituted an "extraordinary circumstance" where he filed state habeas petitions before and after the period in which he sought tolling, and did not show that his condition was significantly worse during this interim time). Because Petitioner has failed to demonstrate that he is entitled to equitable tolling, his application for a writ of habeas corpus must be dismissed.

**IV**

In his application for a writ of habeas corpus, Petitioner contends that his sentence was "in violation of the Sixth Amendment when he was sentenced to the upper term based on the facts neither admitted by Geha nor proven beyond a reasonable doubt, pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004)." (Doc. No. 1) Petitioner argues that statute of limitations on

his *Blakely* claim began on June 24, 2004, when the United States Supreme Court rendered its decision. He further contends that he is entitled statutory tolling of 325 days while his second state habeas petition was pending before the California Supreme Court. He concludes that his *Blakely* claim in his federal application, filed on March 20, 2006, is, therefore, timely. (Doc. No. 17)

Under 28 U.S.C. § 2244(d)(1)(C), the one-year period shall run from the date on which petitioner's conviction became final or upon "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." The Ninth Circuit, however, has held that *Blakely* does not apply retroactively to cases on collateral review. *United States v. Cruz*, 423 F.3d 1119, 1120-21 (9th Cir.2005) (citing to *Shardt v. Payne*, 414 F.3d 1025, 1034-36 (9th Cir. 2005).

///

Good cause appearing therefore, IT IS HEREBY ORDERED that:

1. Respondent's motion to dismiss Petitioner's application for writ of habeas corpus is GRANTED (Doc. No. 8); and

2. The application for a writ of habeas corpus is DISMISSED because it was untimely filed (Doc. No. 1).

/////

DATED: July 2, 2008

/s/ Arthur Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation